UNION PAC. R. CO. et al. v. OREGON & WASHINGTON LUMBER MFRS.' ASS'N et al.

(Circuit Court of Appeals, Ninth Circuit.    October 5, 1908.)

No. 1,525.

Appeal from the Circuit Court of the United States for the District of Oregon.

James B. Kerr, W. W. Cotton, and W. D. Fenton, for appellants.

A. B. Winfree, J. N. Teal, Wirt Minor, Thos. G. Greene, and H. M. Stephens, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge.    This case is in all respects similar to that of Northern Pacific Railway Company et al. v. Pacific Coast Lumber Manufacturers' Association et al. (just decided by this court) 165 Fed. 1.    It involves the same questions, and its decision is governed by the same principles.

The decree appealed from is affirmed.

ROSS, Circuit Judge (dissenting).    This is an appeal from an interlocutory order enjoining the defendant railroad companies from collecting from the complainants in the court below the rates prescribed by the tariff on file with the Interstate Commerce Commission covering the transportation of forest products from points within to points without the state of Oregon, or any rates on such traffic higher than the rates fixed by the tariffs which were superseded by the tariffs in question.    The bill on which the injunction was granted was filed by various corporations alleged to be engaged in the manufacture and sale of lumber, against the railroad companies that are appellants here. The bill alleges that the complainants are corporations organized and existing under the laws of the state of Oregon, and that the incorporation of the various defendant railroad companies is as follows:    The Union Pacific Company and the Oregon Short Line Company under the laws of the state of Utah; the Southern Pacific Company under the laws of Kentucky; the Northern Pacific Company under the laws of Wisconsin; the Great Northern Railway Company under the laws of Minnesota; the Burlington Company under the laws of Iowa; and the Oregon Railroad & Navigation Company, the Astoria & Columbia River Company, the Oregon & California and the Corvallis & Eastern Companies under the laws of Oregon.    The bill alleges that all of the complainants with the exception of the Oregon & Washington Lumber Manufacturers' Association are corporations engaged in the

manufacture and interstate shipment of lumber, and that the manufacturers' association is formed for the purpose of promoting the manufacture and sale of lumber, enlarging the market for its members. and securing suitable transportation routes and reasonable rates for the transportation of lumber from the Pacific Northwest to other points in the United States. It alleges that the defendants are common carriers, and that they, with other participating carriers, filed with the Interstate Commerce Commission, to become effective November 1, 1907, a revised tariff of rates on lumber and forest products from Pacific Coast points to Eastern and Southeastern destinations in other states, 'whereby existing interstate rates on said forest products are to be advanced on the first day of November, 1907, in various degrees, amounting substantially to ten cents a hundred pounds to what is known as the Denver, St. Paul and Chicago territories, seven and one-half cents per hundred pounds to St. Louis territory, and five cents per hundred pounds to Missouri River territory, and certain southeastern destinations in other states. That other changes and advances have been made in the rates on forest products from points and places in the state of Oregon to points and places in other states, all of which will appear in said tariff, which is numbered S. R. 963, I. C. C. No. 850, which said complete and revised tariff of said defendants, and other carriers, showing the advanced rates on lumber and other products, announced to become effective November 1, 1907, is filed herewith."

It is alleged that such increased rates will be exacted by the defendants on and after November 1, 1907, unless restrained by an order of the court, and that such rates were prepared, adopted, and filed by the defendants and the other participating carriers "in pursuance of a combination and conspiracy to stifle and destroy all competition among all of said defendants respecting the transportation of forest products from the state of Oregon and other Northwest Pacific states, and to exact and extort an unreasonable and unjust compensation for the services performed in transporting said forest products, and to divert to the treasuries of said railway companies, through such unjust and unreasonable transportation tax, all, or nearly all, of the profits of the business of the complainants and others engaged in the manufacture of lumber in the state of Oregon and of the other Pacific Northwest states, without regard to the reasonableness of said rates or to the value of the service to be performed and the cost of transporting said products. That each and all of said defendants well knew, at the time said tariff rates were agreed upon and adopted, that said rates were unjust, excessive, unreasonable, extortionate, prohibitive, and discriminatory rates for the transportation of the said lumber products from points and places in the state of Oregon and other states in the Pacific Northwest to the points and places in other states as set out in said tariff, and that the imposition of such advance was not and is not made necessary by reason of any exigencies of the business of any of the said defendants, or by reason of any condition connected therewith or with the transportation of said forest products and the services required with respect thereto; that the imposition and collection of said rates will render the business and plants of your orators

and those similarly situated in the state of Oregon and other points and places in the Pacific Northwest of but little value, and subject your orators to great and irreparable loss."

It is alleged that the said advance in rates so announced to become effective on November 1, 1907, was "brought about by and is the result of agreements and understandings between said 'Hill Lines' and 'Harriman Lines' to suppress competition and for their mutual advantage, without regard to the rights and interests of the public, wherefore your orators submit that said agreements and understandings eliminate the element of competition and constitute a combination in restraint of interstate trade and in violation of said 'Act to protect trade and commerce against unlawful restraint and monopolies,' approved July 2, 1890 (Act July 2, 1890, c. 647, § 1, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), and amendments thereto, and further result in imposing upon your orators and others engaged in the lumber industry an advance in rates which is arbitrary, unjust, unreasonable, and discriminatory both as to places and commodities, and subjects them also to undue and unreasonable prejudices and disadvantages in violation of said act of Congress entitled 'An act to regulate commerce,' approved February 4, 1887 (Act Feb. 4, 1887. c. 104, § 1, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), and acts amendatory and supplementary thereto."

It is alleged that the manufacture of lumber and other forest products constitutes one of the largest and most important industries in the state of Oregon and in the Pacific Northwest; that the complainants and others engaged in the lumber business in the state of Oregon have invested in plants, machinery, equipment, and appurtenances about $60,000,000, not including the value of material on hand, logs, standing timber, or timber lands; that more than 50,000 persons in Oregon are directly engaged in that industry; that the annual pay roll exceeds $30,000,000, and that approximately 100,000 people are directly dependent for their livelihood upon the said industry; that the annual output of lumber of Oregon exceeds 2,000,000,000 feet, of the value of about $30,000,000 at the mills; that the amount of freight annually paid on rail shipments from points in the state to points in other states approximates $12,000,000, such estimates being based on the movement by rail of 600,000,000 feet of lumber, representing about 30,000 car loads. It is alleged that a large part of the investment in the lumber industry in the state of Oregon was made upon the faith that the existing rates of freight to the consuming markets voluntarily placed in effect by all said defendants would not be increased, but rather, in view of the fact that the general trend of rates has been downward for a number of years, and of the marked increase in the tonnage of lumber, said rates would be decreased.

The bill prayed for a final decree of injunction, and also for an injunction pendente lite restraining the defendants from putting into effect the tariff in question. By an amendment to the bill, the complainants added these words:

"Your orators show that this is a civil cause in equity and the amount in controversy exceeds, exclusive of interest and costs, the sum or value of two thousand ($2,000) dollars."

Certain parties were also permitted to join the complainants by petitions in intervention.

Upon a rule to show cause why an injunction pendente lite should not be granted, a hearing was had in the court below on the 31st of October, 1907, at which hearing the Northern Pacific Railway Company appeared specially and moved to dismiss the bill as to it upon the ground that it was entitled, as a corporation of the state of Wisconsin, to be sued only in the district in which it was an inhabitant. The Southern Pacific Company, a Kentucky corporation, likewise appeared specially and for the same purpose, as also did the Oregon Short Line Company. The Burlington Company, the Great Northern Company, and the Union Pacific Company each filed a plea to the jurisdiction, setting up the fact that neither of them was engaged in business in the state of Oregon, and that the pretended service of the subpoena was void. The Oregon Railroad & Navigation Company appeared generally and filed a separate demurrer to the bill. The Astoria & Columbia River Railroad Company, the Oregon & California Railroad Company, and the Corvallis & Eastern Railroad Company appeared generally and filed a joint and several demurrer. After argument, the court, on the 21st of November, 1907, entered an order denying the motions of the Oregon Short Line Railroad Company, the Southern Pacific Company, and the Northern Pacific Railway Company for the dismissal of the bill of complaint, and on the 31st day of October, 1907, entered this order:

"First. The court holds in abeyance motions and pleas as to the want of jurisdiction of this court over the parties defendant and the demurrer to be passed on by this court at a future date, and for the present assumes jurisdiction over such parties.

"Second. That until the further order of this court the carriers who are parties defendant to this suit shall not collect from the parties complainants to this suit, nor the members, firms, and corporations composing, forming, or now represented by the Oregon & Washington Lumber Manufacturers' Association as shown by the list submitted by said association on file in this cause, or from consignees of such parties complainant or parties represented by said Oregon & Washington Lumber Manufacturers' Association, amounts on the shipment of the commodities shown in the tariffs, described in the bill as amended, to wit: I. C. C. No. 850 and Great Northern I. C. C. No. A–2667 and Northern Pacific I. C. C. No. A–3432, in excess of the rate shown in the schedule of tariffs now on file with the Interstate Commerce Commission, covering the transportation of said commodities, superseded by the tariffs on file and above shown, provided that, as a condition of this order, complainants shall execute to the defendants their joint and several bonds, with good and sufficient sureties, in the sum of two hundred and fifty thousand ($250,000) dollars, to be approved by the court, conditioned that the complainants will save, indemnify, and keep harmless the defendants, and each of them, from all loss, cost, and damage by reason of the issuance of this injunction, and further conditioned that if said rates shall be finally held to be reasonable, or rates in excess of those of the superseded tariff shall be established by the Interstate Commerce Commission or this court, each of the complainants who may be served by either of the defendants as a carrier of lumber or shingles shall pay to such carrier or carriers the difference, if any, between the amount paid for such service at the rate heretofore chargeable and whatever rate shall be finally established as the rate lawfully chargeable, on and after November 1, 1907. This order shall take effect immediately, and the bond required shall be executed, approved, and filed on or before November 9, 1907.

"This court specially reserves the right, on showing made, to have additional bonds given from time to time, as it shall deem just and proper.

"This order applies to freight originating on the lines of any party defendant hereto in the state of Oregon.

"Fourth. Whenever any person now a party to this suit as a complainant, or who may hereafter become such party by intervention, shall offer to any of the defendant carriers any of the commodities above specified for shipment under the tariff now in force as prescribed herein, he shall be required to execute and deliver to the carriers an instrument in writing, declaring that he is the consignor of the commodities so offered for shipment, and that the shipment is tendered in accordance with the provisions of this order.

"And it is further ordered that there shall be forthwith filed with the clerk herein, and delivered to each of the defendants, a true and correct statement of the names of all firms, persons, and corporations who are members of or represented by the Oregon & Washington Lumber Manufacturers' Association, and the locations of the mills of such respective parties, and of the location of the mills of all other persons who are parties complainant hereto or may become so by intervention.

"Fifth. Each of the defendants is hereby ordered to furnish and deposit with the clerk of this court reports monthly showing with respect to each shipment made by any of the complainants or interveners in this cause under present rates: (1) The name of the shipper; (2) the character and weight of the shipment; (3) the points of origin and destination; (4) the amounts paid or charged under the present rate; and (5) the difference in amount between the amount so paid or charged and the amount that would accrue under the advance in rate restrained by this order.

"Done and dated in open court this 31st day of October, 1907.

"Charles E. Wolverton, Judge."

From this order the appeal is taken, the errors assigned by the appellants being:

(1) The Circuit Court erred in failing to dismiss the bill upon the ground that there was no jurisdiction of the controversy.

(2) The court erred in failing to dismiss the bill as to the defendants which were corporations under the laws of states other than the state of Oregon, upon the ground that none of said defendants was an inhabitant of the District of Oregon, and each of said defendants was objecting to being sued in that district.

(3) The court erred in granting the decree of injunction against the defendants which were corporations under the laws of the state of Oregon, for the reason that all of the complainants were corporations of the state of Oregon, and the court had no jurisdiction of the case as to said defendants because the complainants were citizens of the same state.

(4) The court erred in failing to dismiss the bill for the reason that no controversy was presented involving $2,000, exclusive of interest and costs, and therefore the court was without jurisdiction.

(5) The court erred in failing to dismiss the bill for the reason that the suit is not one arising under the Constitution or laws of the United States, or treaties made under their authority, and therefore the court had no jurisdiction.

(6) The court erred in failing to dismiss the bill for the reason that the controversy with respect to the reasonableness of the rates in question is a matter committed exclusively to the Interstate Commerce Commission by the act to regulate commerce, approved February 4, 1887, and the acts amendatory thereof.

(7) The court erred in entering the decree appealed from for the

165 F.—2

reason that it commands the defendants to discriminate between persons in violation of the act to regulate commerce.

(8) The court erred in entering the decree appealed from for the reason that it commands the defendants to collect from the complainants amounts less than the amounts shown in the tariffs which are by law fixed as the only legal rates.

(9) The court erred in entering the decree appealed from for the reason that it appears on the face of the bill that there are omitted, as parties defendant, participating carriers, parties to the tariff complained of, whose names are set forth at pages 01 and 02 of the tariff filed as a part of the bill.

In this court the appellees moved to dismiss the appeal on the ground that only questions of jurisdiction are involved, and therefore that the appeal should have been taken to the Supreme Court. The answer to the motion is that the appeal to this court was taken not only on the ground of the lack of jurisdiction of the court below over the cause of action alleged, but also upon the ground that the order appealed from commands the defendants to violate the act of Congress to regulate commerce, and on the further ground that it was made in the absence of indispensable parties. Only the question of jurisdiction can be taken from the trial court directly to the Supreme Court, and then only questions "involving the jurisdiction of the Circuit Court as a federal court." Louisville Trust Co. v. Knott, 191 U. S. 225, 233, 24 Sup. Ct. 119, 122, 48 L. Ed. 159; U. S. v. Jahn, 155 U. S. 105–115, 15 Sup. Ct. 39, 39 L. Ed. 87.

I agree that the motion to dismiss should be denied. Also untenable, in my opinion, is the position of the appellants to the effect that the case does not present a federal question, and that therefore the citizenship of the parties was the test of jurisdiction in the court below.

I think it obvious that the real question in the case was whether or not the interstate commerce act deprived the court below of the power to grant the injunction complained of, which it otherwise unquestionably had; for I do not understand it to be disputed—certainly it cannot be successfully disputed—that but for that act a court of equity is not only empowered, but that it would be its duty, to enjoin a common carrier from exacting exorbitant or unreasonable rates for the transportation of freight. I repeat, therefore, that the real question here is, what is the effect of the interstate commerce act upon that otherwise conceded power in the court below, the solution of which question is essentially and necessarily a federal question, since it depends entirely upon the proper construction of an act of Congress? Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426–433, 27 Sup. Ct. 350, 51 L. Ed. 553. In that case the question was whether the conceded common-law right of the oil company to recover in an action at law in the Circuit Court the excess over a just and reasonable rate, of a charge exacted by the carriers for the transportation of certain cotton seed, was taken away by the provisions of the interstate commerce act.

"Both parties," said the court (204 U. S. 437, 27 Sup. Ct. 353, 51 L. Ed. 553), "concede that the question for decision has not been directly passed upon by this court and that its determination is only persuasively influenced by ad-

judications of other courts. They both hence mainly rely upon the text of the act to regulate commerce as it existed at the time the shipments in question were made. The case, therefore, must rest upon an interpretation of the text of the act and is measurably one of first impression.

"Let us, without going into detail, give an outline of the general scope of that act with the object of fixing the rights which it was intended to conserve or create, the wrongs which it proposed to redress, and the remedies which the act established to accomplish the purposes which the lawmakers had in view.

"The act made it the duty of carriers subject to its provisions to charge only just and reasonable rates. To that end the duty was imposed of establishing and publishing schedules of such rates. It forbade all unjust preferences and discriminations, made it unlawful to depart from the rates in the established schedules until the same were changed as authorized by the act, and such departure was made an offense punishable by fine or imprisonment, or both, and the prohibitions of the act and the punishments which it imposed were directed not only against carriers but against shippers, or any person who, directly or indirectly, by any machination or device in any manner whatsoever, accomplished the result of producing the wrongful discriminations or preferences which the act forbade. It was made the duty of carriers subject to the act to file with the Interstate Commerce Commission created by that act copies of established schedules, and power was conferred upon that body to provide as to the form of the schedules, and penalties were imposed for not establishing and filing the required schedules. The commission was endowed with plenary administrative power to supervise the conduct of carriers, to investigate their affairs, their accounts and their methods of dealing, and generally to enforce the provisions of the act. To that end it was made the duty of the District Attorneys of the United States, under the direction of the Attorney General, to prosecute proceedings commenced by the commission to enforce compliance with the act. The act specially provided that whenever any common carrier subject to its provisions 'shall do, cause to be done, or permit to be done, any act, matter, or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act. * * *' Power was conferred upon the commission to hear complaints concerning violations of the act, to investigate the same, and, if the complaints were well founded, to direct not only the making of reparation to the injured persons, but to order the carrier to desist from such violation in the future. In the event of the failure of a carrier to obey the order of the commission, that body, or the party in whose favor an award of reparation was made, was empowered to compel obedience by invoking the authority of the courts of the United States in the manner pointed out in the statute, prima facie effect in such courts being given to the findings of fact made by the commission. By the ninth section of that act it was provided as follows:

"'That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act may either make complaint to the commission, as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this act, in any District or Circuit Court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt. * * *'

"And by section 22, which we shall hereafter fully consider, existing appropriate common-law and statutory remedies were saved.

"When the act to regulate commerce was enacted there was contrariety of opinion whether, when a rate charged by a carrier was in and of itself reasonable, the person from whom such a charge was exacted had at common law an action against the carrier because of damage asserted to have been suffered by a discrimination against such person or a preference given by the carrier to another. Parsons v. Chicago & Northwestern Ry., 167 U. S. 447,

455, 17 Sup. Ct. 887, 42 L. Ed. 231; Interstate Commerce Commission v. Baltimore & Ohio R. R., 145 U. S. 263, 275, 12 Sup. Ct. 844, 36 L. Ed. 699. That the act to regulate commerce was intended to afford an effective means for redressing the wrongs resulting from unjust discrimination and undue preference is undoubted. Indeed, it is not open to controversy that to provide for these subjects was among the principal purposes of the act. Interstate Commerce Commission v. Cincinnati, New Orleans & Texas Pacific Ry. Co., 167 U. S. 479, 491, 17 Sup. Ct. 896, 42 L. Ed. 243. And it is apparent that the means by which these great purposes were to be accomplished was the placing upon all carriers the positive duty to establish schedules of reasonable rates which should have a uniform application to all and which should not be departed from so long as the established schedule remained unaltered in the manner provided by law. Cincinnati, New Orleans & Texas Pacific Ry. Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935; Interstate Commerce Commission v. Cincinnati, New Orleans & Texas Pacific Ry. Co., 167 U. S. 479, 17 Sup. Ct. 896, 42 L. Ed. 243.

"When the general scope of the act is enlightened by the considerations just stated, it becomes manifest that there is not only a relation, but an indissoluble unity, between the provision for the establishment and maintenance of rates until corrected in accordance with the statute and the prohibitions against preferences and discrimination. This follows because, unless the requirement of a uniform standard of rates be complied with, it would result that violations of the statute as to preferences and discrimination would inevitably follow. This is clearly so, for if it be that the standard of rates fixed in the mode provided by the statute could be treated on the complaint of a shipper by a court and jury as unreasonable, without reference to a prior action by the commission finding the established rate to be unreasonable and ordering the carrier to desist in the future from violating the act, it would come to pass, that a shipper might obtain relief upon the basis that the established rate was unreasonable, in the opinion of a court and jury, and thus such shipper would receive a preference or discrimination not enjoyed by those against whom the schedule of rates was continued to be enforced. This can only be met by the suggestion that the judgment of a court, when based upon a complaint made by a shipper without previous action by the commission, would give rise to a change of the schedule rate and thus cause the new rate resulting from the action of the court to be applicable in future as to all. This suggestion, however, is manifestly without merit, and only serves to illustrate the absolute destruction of the act and the remedial provisions which it created which would arise from a recognition of the right asserted. For if, without previous action by the commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that unless all courts reached an identical conclusion, a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question. Indeed, the recognition of such a right is wholly inconsistent with the administrative power conferred upon the commission, and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the commission, would lead to favoritism, to the enforcement of one rate in one jurisdiction and a different one in another, would destroy the prohibitions against preferences and discrimination, and afford, moreover, a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted. Indeed, no reason can be perceived for the enactment of the provision endowing the administrative tribunal, which the act created, with power, on due proof, not only to award reparation to a particular shipper, but to command the carrier to desist from violation of the act in the future, thus compelling the alteration of the old or the filing of a new schedule, conformably to the action of the commission, if the power was left in courts to grant relief on complaint of any shipper, upon the theory that the established rate could be disregarded and be treated as unreasonable, without reference to previous action by the

commission in the premises. This must be, because, if the power existed in both courts and the commission to originally hear complaints on this subject, there might be a divergence between the action of the commission and the decision of a court. In other words, the established schedule might be found reasonable by the commission in the first instance and unreasonable by a court acting originally, and thus a conflict would arise which would render the enforcement of the act impossible.

"Nor is there merit in the contention that section 9 of the act compels to the conclusion that it was the purpose of Congress to confer power upon courts primarily to relieve from the duty of enforcing the established rate by finding that the same as to a particular person or corporation was so unreasonable as to justify an award of damages. True it is that the general terms of the section when taken alone might sanction such a conclusion, but when the provision of that section is read in connection with the context of the act and in the light of the considerations which we have enumerated we think the broad construction contended for is not admissible. And this becomes particularly cogent when it is observed that the power of the courts to award damages to those claiming to have been injured, as provided in the section, contemplates only a decree in favor of the individual complainant, redressing the particular wrong asserted to have been done, and does not embrace the power to direct the carrier to abstain in the future from similar violations of the act; in other words, to command a correction of the established schedules, which power, as we have shown, is conferred by the act upon the commission in express terms. In other words, we think that it inevitably follows from the context of the act that the independent rights of an individual originally to maintain actions in courts to obtain pecuniary redress for violations of the act conferred by the ninth section must be confined to redress of such wrongs as can, consistently with the context of the act, be redressed by courts without previous action by the commission, and, therefore, does not imply the power in a court to primarily hear complaints concerning wrongs of the character of the one here complained of. Although an established schedule of rates may have been altered by a carrier voluntarily or as the result of the enforcement of an order of the commission to desist from violating the law, rendered in accordance with the provisions of the statute, it may not be doubted that the power of the commission would nevertheless extend to hearing legal complaints of and awarding reparation to individuals for wrongs unlawfully suffered from the application of the unreasonable schedule during the period when such schedule was in force."

This clear analysis of the provisions of the act in question, and comprehensive and lucid exposition of its purposes and intent, would seem to leave nothing more to be said in order to show that, until prior action by the commission, no court is empowered, upon the complaint of a shipper, to determine or consider the reasonableness or unreasonableness of established rates. The court, in its opinion, expressly concedes that that pre-existing power in the courts was not expressly taken away by the interstate commerce act, but holds that such was the necessary effect of its provisions, and that, therefore, that result "was accomplished by implication." Nor, in my opinion, would there be any occasion for saying anything further upon the subject, but for the subsequent decision of the same court in the case of Southern Ry. Co. v. Tift, 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124. I find it impossible to believe that the Supreme Court intended by its decision in the last-mentioned case to overrule or change or modify, without saying so, its interpretation of the act in question, and the consequent results of it, so clearly enunciated but a short time before in the elaborate opinion, delivered after a careful analysis of the various provisions of the act, and from which I have above quoted at length. Nor do I think the Tift Case, rightly and carefully consider-

ed, justifies any such contention. It is entirely true that that case, like the present one, was brought in a Circuit Court, prior to any action by or before the Interstate Commerce Commission, to obtain an injunction and a temporary restraining order enjoining the defendant carrier companies from advancing the rates theretofore established and in force to what the complainants there, as here, alleged would be unjust, unreasonable, and extortionate rates, and that the Circuit Court there first granted the temporary restraining order asked for, which it subsequently dissolved; but it retained the cause and annexed to its order dissolving the temporary restraining order this condition:

"In case the respondents shall enforce the rates complained of, and the complainants shall make proper application to the Interstate Commerce Commission to redress their alleged grievances, the court will entertain a renewed application on the record as made, and such appropriate additions thereto as may be proposed by either party, enjoining the enforcement of such rates, pending the investigation of the commission, unless otherwise dissolved, and on presentation to the court of the report of the commission such other action be taken as will be conformable to law and the principles of equity."

The Supreme Court, in its statement of the case, proceeded as follows:

"The appellants took the steps prescribed by the interstate commerce act to put the advanced rates into effect, and the appellees, on June 23, 1903, filed a petition before the Interstate Commerce Commission, charging that 'in promulgating said tariff of increased rates and maintaining and enforcing the same' the appellants were acting in 'concert with each other and with other lumber carrying roads,' who with them were 'co-members of the Southern Freight Association.' The petition also charged that the advance was 'arbitrary, unreasonable and unjust,' and prayed for an order commanding appellants, and each of them, to desist from enforcing the advance. All of the appellants except the Macon & Birmingham Railway Company filed a joint and several answer, in which they traversed the allegations of the petition and pleaded justification by the conditions affecting the roads and the traffic. They also alleged that the Georgia Sawmill Association, to which appellees belonged, was a combination in restraint of trade and commerce, and that, therefore, appellees did not 'come before the commission with clean hands.' A great deal of testimony was taken on the issues presented, and the commission found and concluded that the advance in rates 'was not warranted by the testimony, and that the increased rates put in force June 22, 1903, were unreasonable and unjust.' The specific findings and conclusions of the commission are reported in 10 Interst. Com. R. 548. After the petition was filed before the Interstate Commerce Commission, but before final action, appellees filed an amended bill and again moved the Circuit Court for an injunction. In the amended bill it was alleged that appellants, after the dissolution of the restraining order, filed with the Interstate Commerce Commission and gave public notice that on June 22, 1903, the advance in sales on lumber would be established and put in effect, and such advance became effective June 22, 1903. The appellants in a joint and several answer admitted the averments of the amended bill, but reserved the benefit of their demurrer to the original bill. The motion for an injunction was dismissed. 123 Fed. 789.

"The commission made its order hereinbefore referred to on the 7th of February, 1905, and on March 17, 1905, the appellees presented a petition to the Circuit Court stating the substance of the findings of the commission and attaching a copy of its report and opinion.

"An order to show cause was issued. On June 3, 1905, appellants filed a joint and several answer, which was verified. The Southeastern Association answered separately. The appellees also filed a supplemental bill, the purpose of which was to obtain restitution of the excess of rates charged over those which it was alleged were unreasonable. To this bill a demurrer was filed.

"It was stipulated by counsel of the respective parties that the testimony, in-

cluding exhibits, taken before the Interstate Commerce Commission, should be filed in the case subject only to objections to its relevancy. In addition to such testimony other evidence was submitted to the Circuit Court, and that court rendered a decree July, 1905, that the advance in rates 'from lumber shipping points, within the state of Georgia to Cincinnati, Louisville, Evansville, Cairo, and other points on the Ohio river or crossings was and is excessive, unreasonable, and unjust, and in violation of the provisions of the act of Congress, known as the "Act to regulate commerce," and the amendments thereto, and that the rates and charges resulting from said advance are likewise excessive, unreasonable, and unjust, and in violation of the act to regulate commerce.' The appellants were enjoined, as we have already said, from enforcing the advance.

"The decree also directed an order of reference to the standing master of the pleadings and evidence in the cause, with instructions to ascertain the sum total of the increase in rates paid by each of the appellees and other members of the Georgia Sawmill Association to either or all of the appellants since the rate went into effect. This was done, the decree recited, in pursuance of a stipulation made by the respondents (appellants) in open court that, in case the complainants (appellees) prevailed, decree of restitution might be made. 138 Fed. 753. The decree was affirmed by the Circuit Court of Appeals without an opinion."

That was the record before the Supreme Court in the Tift Case. Now let us see what the court said:

"On the merits, as distinguished from the questions which concern the jurisdiction and procedure in the Circuit Court, this case is, though variant in some detail of facts, similar in principle and depends upon the same legal considerations as Illinois Central Railroad Company v. Interstate Commerce Commission, just decided. [206 U. S. 441, 27 Sup. Ct. 700, 51 L. Ed. 1128.] The advance here involved grew out of the same action by the railroads there considered, and is the advance there referred to as having been made west of the Mississippi. This case was argued and submitted with that, and depends on the same ultimate contentions. We need not repeat the discussion of those contentions nor trace out or dwell upon the many subsidiary considerations which the assignments of error and the elaborate briefs of counsel present.

"In the case at bar, however, there are assignments of error based on the objections to the jurisdiction of the Circuit Court. These might present serious questions in view of our decision in Texas & Pacific Railroad Company v. Abilene Cotton Oil Company, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, upon a different record than that before us. We are not required to say, however, that, because an action at law for damages to recover unreasonable rates which have been exacted in accordance with the schedule of rates as filed is forbidden by the interstate commerce act, a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of unreasonable rates or a change to unjust or unreasonable rates. The Circuit Court granted no relief prejudicial to appellants on the original bill. It sent the parties to the Interstate Commerce Commission, where, upon sufficient pleadings, identical with those before the court, and upon testimony adduced upon the issues made, the decision was adverse to the appellants. This action of the commission, with its findings and conclusions, was presented to the Circuit Court, and it was upon these, in effect, the decree of the court was rendered. There was no demurrer to that petition, and the testimony taken before the commission was stipulated into the case, and the opinion of the court recites that, 'with equal meritorious purpose, counsel for respective parties agreed that this would stand for and be the hearing for final decree in equity.'

"It was certainly competent for the appellees to proceed in the Circuit Court under section 16 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3165]), and to apply by petition to the Circuit Court, 'sitting in equity,' for the court to hear and determine the matter 'as a court of equity,' and issue an injunction 'or other proper process, mandatory or otherwise,' to enforce the order of the commission. We think that under the broad powers conferred upon the Circuit Court by section 16 and the direction there given to the court to proceed with efficiency, but without

the formality of equity proceedings, 'but in such manner as to do justice in the premises,' and in view of the stipulation of the parties, recited in the decree of the court, the appellants are precluded from making the objection that the court did not have jurisdiction to entertain the petition and grant the relief prayed for and decreed."

I have given to this language of the court attentive and careful consideration, and my conclusion is that the learned justice who wrote the opinion, and the justices who concurred with him, based their affirmance of the judgment of the Circuit Court entirely upon the findings and conclusions of the Interstate Commerce Commission, and upon the subsequent proceedings in the Circuit Court based thereon.

"The Circuit Court," said the Supreme Court, "granted no relief prejudicial to appellants on the original bill. It sent the parties to the Interstate Commerce Commission, where, upon sufficient pleadings, identical with those before the court, and upon testimony adduced upon the issues made, the decision was adverse to the appellants. This action of the commission, with its findings and conclusions, was presented to the Circuit Court, *and it was upon these, in effect, the decree of the court was rendered.* (Italics mine.) There was no demurrer to that petition (evidently the petition to the Circuit Court asking the enforcement of the findings and conclusions of the commission), and the testimony taken before the commission was stipulated into the case, and the opinion of the court recites that, 'with equal meritorious purpose, counsel for the respective parties agreed that this would stand for and be the hearing for final decree in equity.' It was certainly competent for the appellees to proceed in the Circuit Court under section 16 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3165]), and to apply by petition to the Circuit Court, 'sitting in equity,' for the court to hear and determine the matter 'as a court of equity,' and issue an injunction 'or other proper process, mandatory or otherwise,' to enforce the order of the commission. We think that under the broad powers conferred upon the Circuit Court by section 16 and the direction there given to the court to proceed with efficiency, but without the formality of equity proceedings, 'but in such manner as to do justice in the premises,' and in view of the stipulation of the parties, recited in the decree of the court, the appellants are precluded from making the objection that the court *did not have jurisdiction to entertain the petition and grant the relief prayed for and decreed."* (Italics mine.)

As already said, the court in the Tift Case evidently based its affirmance of the judgment appealed from entirely upon the findings and conclusions of the Interstate Commerce Commission and the subsequent proceedings in the Circuit Court for the enforcement of those findings and conclusions, ignoring the prior proceedings in the Circuit Court. I have not overlooked that clause in the opinion in that case where it was said:

"We are not required to say, however, that, because an action at law for damages to recover unreasonable rates which have been exacted in accordance with the schedule of rates as filed is forbidden by the interstate commerce act, a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of unreasonable rates or a change to unjust or unreasonable rates."

This is certainly not saying that such a suit in equity may be brought prior to any action by the Interstate Commerce Commission. That the court did not intend by its decision in Southern Railway Co. v. Tift to overrule or in any way change or modify its opinion in the preceding case of Texas & Pacific Railway Co. v. Abilene Cotton Oil Company is, I think, also shown by the clause of its opinion immediately preceding that last quoted, which reads:

"In the case at bar, however, there are assignments of error based on the objections to the jurisdiction of the Circuit Court. These might present serious questions in view of our decision in Texas & Pacific Railroad Company v. Abilene Cotton Oil Company, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, upon a different record than that before us."

And by the following clause near the end of the opinion in the Tift Case:

"In support of these contentions appellants rely on Texas & Pacific Railway v. Abilene Cotton Oil Company, supra. In that case the Abilene Cotton Oil Company sued in one of the courts in Texas to recover the excess of what it alleged to be an unjust and unreasonable charge on shipments of car loads of cotton seed. The defense was that the rates were charged according to the schedule of rates filed under the interstate commerce act, and that the court had no jurisdiction to grant relief upon the basis that the established rate was unreasonable, when it had not been found to be so by the Interstate Commerce Commission. The defense prevailed in the trial court, but did not prevail in the Court of Civil Appeals, where judgment was rendered in favor of the cotton oil company. The judgment was reversed by this court on the ground that the state courts had no jurisdiction to entertain a suit based on the unreasonableness of a rate as published in advance of the action of the Interstate Commerce Commission adjudging the rate unreasonable. And it was in effect held that reparation after such action for the excess above a reasonable rate must be by a proceeding before the commission, 'because of a wrong endured during the period when the unreasonable schedule was enforced by the carrier and before its change and the establishment of a new one.' There is nothing in that case, however, which precludes the parties, after action by the commission declaring rates unreasonable, from stipulating in the proceedings prosecuted under section 16 that the court adjudge the amount of reparation. By the action of the commission the foundation for reparation, as provided in the interstate commerce act, was established, and the inquiry submitted to the court was but of its amount, and had the natural and justifiable inducement to end all the controversies between the parties without carrying part of them to another tribunal."

For the reasons stated I think the judgment should be reversed and the case remanded, with directions to the court below to dismiss the bill at the complainants' cost.