M. C. KISER CO. et al. v. CENTRAL OF GEORGIA RY. CO. et al.

(Circuit Court, N. D. Georgia. December 21, 1907.)

COMMERCE—CARRIERS—INTERSTATE COMMERCE—ENJOINING INCREASE OF RATES —JURISDICTION OF COURTS.

By the interstate commerce act and its amendment (Act Feb. 4, 1887, c. 104, §§ 11–15, 24 Stat. 382–384 [U. S. Comp. St. 1901, pp. 3161–3165], and Act June 29, 1906, c. 3591, § 4, 34 Stat. 589 [U. S. Comp. St. Supp. 1907, p. 900]) general power over interstate rates to be charged by common carriers is given to the Interstate Commerce Commission, and the courts are without jurisdiction to determine what are reasonable or un-

reasonable rates. A court of equity, however, may properly enjoin carriers from establishing, or increasing to, a rate believed to be unreasonable, at the same time leaving the matter in such shape that the commission may ultimately determine the question of the reasonableness of the proposed rate and prescribe what will be a just and reasonable rate.

In Equity. On motion for preliminary injunction.

Wimbish, Watkins & Ellis, for complainants.

DuBignon & Alston, for defendant Atlantic Coast Line.

Dorsey, Brewster, Howell & Heyman, and C. B. Northrop, for defendant Southern Railway Co.

Brown & Randolph, for defendant Seaboard Air Line Ry. Co.

Lawton & Cunningham, for defendants Central of Georgia Ry. Co. and Ocean Steamship Co. of Savannah.

Edward Baxter, special counsel, for all respondents.

NEWMAN, District Judge. This bill is brought by the M. C. Kiser Company and J. K. Orr Shoe Company, Georgia corporations engaged in the boot and shoe business in Atlanta, against the Central of Georgia Railway Company, a Georgia corporation, the Southern Railway Company, a Virginia corporation, the Seaboard Air Line Railway, a corporation of Virginia and North Carolina, the Atlantic Coast Line Railroad Company, a Virginia corporation, the Ocean Steamship Company of Savannah, a Georgia corporation, and the Merchants' & Miners' Transportation Company, a Maryland corporation. The purpose of the bill is to enjoin the defendants from increasing the rate on boots and shoes from eastern ports (Boston, Providence, and New York) by water and rail to Atlanta, Ga. The rate at the time the bill was filed was 85 cents per 100 pounds, and the proposed increase was to $1.05 per 100 pounds in any quantity, and 93 cents per 100 pounds by the car load. The proposed car load rate of 93 cents is immaterial in this investigation by reason of facts which will be hereafter stated. The bill was filed on April 29, 1905, and a temporary restraining order granted, which has been in effect since that time. The defendants answered the bill and considerable testimony was taken. The parties have agreed that the present hearing should be the final hearing in the case, and that final decree may now be entered on the pleadings and evidence.

The history of the matters leading up to the present controversy between the complainants and the defendant companies is this: Prior to February 1, 1905, boots and shoes were carried from the eastern cities named, by water and rail at a rate of $1.14 per 100 pounds. The merchants of Atlanta engaged as jobbers in the boot and shoe business had tried for several years to have this rate reduced. During the argument of the case in this court seeking to enjoin circular 301, issued by the Railroad Commission of Georgia, Mr. Ed Baxter, counsel for the railroads, suggested to the opposing counsel in that case that, if circular 301 could be withdrawn, he believed that the various railroads operating in this territory would agree to a general reduction of their tariff of freight rates; at least, he would earnestly recommend the same, and he believed his recommendation would be followed.

Thereupon circular 301 was revoked, and a committee was appointed from the Atlanta Chamber of Commerce to meet representatives of the railroads interested to take up this matter. Meetings were held in Atlanta, and the whole subject of rates in the Atlanta territory discussed. Finally, at a meeting held by the railway representatives in St. Augustine, among other reductions of rates made to Atlanta was that of a reduction to 85 cents per 100 pounds on boots and shoes from the eastern points named to Atlanta by water and rail. The rate of 85 cents was to apply only to car load lots of not less than 24,000 pounds, and to be shipped at one time from one consignor to one consignee. This rate went into effect February 1, 1905. Soon after the rate went into effect, it developed that manufacturers did not ship to any one jobber at one time as much as 24,000 pounds. In order to diversify their stock, the jobbers buying from manufacturers of different classes of goods had shipments made from the various factories in much less quantities than 24,000 pounds. In order to avoid this, the Ocean Steamship Company allowed various shipments from the interior to be assembled on its docks in Boston until as much as 24,000 pounds had been collected, when the same was put on board a steamer, and shipped as a car load at the car load rate. The other transportation lines, not having the dock facilities of the Ocean Steamship Company at Boston, permitted some shipments to be made at the 85-cent rate in any quantity in order to meet the action of the Ocean Steamship Company. The Merchants' & Miners' Transportation Company, acting in conjunction with the Seaboard Air Line Railway, soon after announced an 85-cent any quantity rate. After this, the other lines interested submitted to this arrangement, and the 85-cent any quantity rate seems to have become general by all the water and rail companies operating from eastern ports to Atlanta. It seems that the lines of the defendants in this case, and perhaps others coming into Atlanta, are known as "eastern lines," whereas, there are certain lines known as "western lines," coming into Atlanta and surrounding territory from what are called "Ohio river points," bringing merchandise from Chicago, Cincinnati, St. Louis, Louisville, and other cities. These western lines, upon the adoption by the eastern lines of the water and rail rate of 85 cents per 100 pounds in car load lots, adopted an any quantity rate of 85 cents from these western points to Atlanta and surrounding territory. It is shown by the record that the business of manufacturing boots and shoes has of recent years developed and grown to considerable proportions in a number of western cities, and competition from that source appears to be an important consideration in the rate-making in question here. The result of all this was, whatever may have been the cause, that all the railway and transportation companies participating in the 85-cent rate from eastern points to Atlanta, by a circular issued April 12, 1905, gave notice that on May 1st the rate on boots and shoes would be increased to 93 cents in car load lots and $1.05 in less than car load lots. This advance was simultaneous on the part of all the railroads interested in the rate. This, as was stated in the beginning, may be considered so far as Atlanta jobbers in boots and shoes are concerned as an advance of 20 cents per 100 pounds; the car load rate being entirely

impracticable. The testimony is convincing as to this. Mr. W. A. Wilburn, second vice president of the Central of Georgia Railway Company, and in charge of traffic, was one of the witnesses for the defendants, and he goes into this matter of the extent to which the car load rate could be of benefit to the complainants more thoroughly probably than the other witnesses: He made a personal investigation of the matter in Boston, and endeavored to arrange for assembling the goods in car load lots, but states in his testimony that the best plan that could be adopted would have cost the shippers as much as $1.05 per 100 pounds. The whole record shows quite clearly that it is utterly useless for the Atlanta jobbers to try to utilize the car load rate, so that the proposed increase in rates may be considered as to the complainants an increase of 20 cents per 100 pounds; that is, from 85 cents to $1.05.

The questions in this case, at least such as have been discussed, and need be considered, are, first, that of the jurisdiction of the court, and, in connection with it, that of the reasonableness of the proposed increase in rate. The jurisdiction of the court is challenged by the demurrer as follows:

"Because the granting of the injunction sought for by complainants in said bill of complaint would, in effect, fix the rate to be charged by this defendant and its connections in the future for the transportation of boots and shoes from Boston, Mass., Providence. R. I., and Philadelphia, Pa., to Atlanta, Ga., at the rates now prevailing as the maximum rates; and the right to fix such rates is a legislative power, and not a judicial one."

On this question of jurisdiction the two important cases at present are Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 555, and Southern Railway Company v. Tift, 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124. The former case was a suit by the Abilene Cotton Oil Company against the railway company to recover an excess charge over what would have been a reasonable rate for shipments of cotton seed from points in Louisiana to Abilene, Tex. There was a verdict for the defendant, and the case went through the Supreme Court of Texas, where the judgment to the trial court was reversed, to the Supreme Court of the United States, where the judgment of the state Supreme Court was reversed. The decision of the Supreme Court of the United States, as expressed in the opinion in that case by Mr. Justice White, is very broad and comprehensive in character. That case, it is true, was an action at law by one shipper to recover an excess freight charge; and it might be said with much force that a suit at law by one shipper to recover an overcharge is a very different thing from a suit in equity seeking to enjoin a rate for the benefit of all shippers of a particular class. In the first instance, a preference is obtained by the one shipper, if he succeeds, over others, and in the latter all of the same class share in the result of the court's action, if favorable. But the grounds on which the denial of the court's jurisdiction in the Abilene Case goes is such that it would seem to deny to the courts generally jurisdiction of all controversies as to the reasonableness of interstate rates. It is distinctly held that the power conferred upon the Interstate Commerce Commission in respect to rates by the interstate commerce act

is wholly inconsistent with the right of the courts to pass upon the reasonableness of an established rate. An extract from the opinion in the Abilene Case will show the reasoning adopted by the Supreme Court in that case:

"For if, without previous action by the commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that, unless all courts reached an identical conclusion, a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question. Indeed, the recognition of such a right is wholly inconsistent with the administrative power conferred upon the commission, and with the duty which the court casts upon that body of seeing to it that the statutory requirements as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the commission, would lead to favoritism, to the enforcement of one rate in one jurisdiction, and a different one in another, would destroy the prohibitions against preferences and discrimination, and afford, moreover, a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted. Indeed, no reason can be perceived for the enactment of the provision endowing the administrative tribunal, which the act created, with power, on due proof, not only to award reparation to a particular shipper, but to command the carrier to desist from violation of the act in the future, thus compelling the alteration of the old, or the filing of a new schedule conformably to the action of the commission, if the power was left in courts to grant relief on complaint of any shipper, upon the theory that the established rate could be disregarded and be treated as unreasonable, without reference to previous action by the commission in the premises. This must be, because, if the power existed in both the courts and the commission to originally hear complaint on this subject, there might be a divergence between the action of the commission and the decision of a court. In other words, the established schedule might be found reasonable by the commission in the first instance, and unreasonable by a court acting originally, and thus a conflict would arise which would render the enforcement of the act impossible."

The Tift Case, cited above, was a bill in the Southern district of this state seeking to enjoin an increase in freight rates by the defendant railway companies on yellow pine lumber. In that case a restraining order was granted in the Circuit Court, but the same was dissolved to allow application to be made to the Interstate Commerce Commission for relief. The action of the commission, holding the proposed increase in rates unreasonable, was brought before the Circuit Court, and the proceedings, including the evidence before the commission, were stipulated into the record before the Circuit Court. Thereupon, after hearing, a permanent injunction was granted. The case went on appeal to the Supreme Court of the United States, and the judgment of the Circuit Court was affirmed. The Supreme Court sustained the jurisdiction of the Circuit Court. Stating what might be the qualification or exception to the general rule announced in the Abilene Case, the court in the opinion by Mr. Justice McKenna said:

"In the case at bar, however, there are assignments of error based on the objections to the jurisdiction of the Circuit Court. These might present serious questions in view of our decision in Texas & Pacific Railroad Company v. Abilene Cotton Oil Company, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 555, upon a different record than that before us. We are not required to say, however, that, because an action at law for damages to recover unreasonable rates which have been exacted in accordance with the schedule of rates as

filed is forbidden by the interstate commerce act, a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of unreasonable rates or a change to unjust or unreasonable rates."

Other authority is cited bearing more or less upon the question of jurisdiction here, but the two decisions just referred to seem to be controlling when it is ascertained what is held by the court, considering the two cases together. From what is said in both cases, the ruling would seem to be that general power over interstate rates to be charged by common carriers is given to the Interstate Commerce Commission, and that for the courts to undertake to determine what are reasonable or unreasonable rates would interfere and conflict with the exercise of this power by the commission, although instances might arise in which it would be proper for a court of equity to enjoin the enforcement of unreasonable rates or a change to unjust or unreasonable rates; but that this action of a court of equity will not interfere with the final exercise by the Interstate Commerce Commission of the full powers granted to it by the act of Congress of 1887 to determine whether a given rate is an unjust and unreasonable rate, or under the act of June 1906 "to determine and prescribe what will be a just and reasonable rate or rates, charge or charges, to be thereafter observed * * * as the maximum to be charged." This seems to be the clear meaning of these decisions. It appears, therefore, that the court might properly enjoin carriers from establishing, or increasing to, an unreasonable rate, at the same time leaving the matter in such shape as that the Interstate Commerce Commission may ultimately determine whether the contemplated increase is just and reasonable. Considerable testimony has been taken in this case as to the reasonableness of the present rate and of the proposed rate. Evidence has been offered as to the relative cost of transporting boots and shoes and other commodities; also evidence as to the increase in the volume of shipments of boots and shoes under the 85-cent rate; also evidence as to whether the existing rate of 85 cents was reached by competition between the carriers and was brought about as a legitimate result of such competition; also, whether the proposed increase in rate was the result of a combination between the carriers, or was the action of each carrier and its connections acting separately and independently. The evidence in the case fails to show that the present rate of 85 cents has worked injury to the carrier companies. The volume of business over the defendant companies' lines has increased largely since the new rate went into effect. The 85-cent rate became effective February 1, 1905, so that from one month to a month and a half's business of that year was done under the old rate of $1.14 and 11 months under the new rate. The year 1905 showed some increase in business over 1904; but the first six months of 1906, the last period available when the testimony in this case was taken, showed such increase as that it could reasonably be expected that the amount of boots and shoes coming into Atlanta over the eastern lines during the entire year of 1906 with the 85-cent rate would be about double that of 1904 under the $1.14 rate.

What the relative cost of it was cannot be determined on this record. It is shown on behalf of the defendant companies that the

amount of freight per car received on boots and shoes is less than that received on other classes of goods; on some classes very much less. Taking this whole record together and considering the manner in which the 85-cent rate was reached, and its effect upon the jobber, the carrier, and the volume of business since it became operative, comparing this rate with the rate on boots and shoes to other points, and considering as far as possible everything that would throw light on the question, I am satisfied the 85-cent rate may well remain of force until it can be properly determined what is a reasonable rate. Indeed, there is nothing in this record to show that the 85-cent any quantity rate would not have been continued by the eastern lines, defendants here, but for the action of the western lines, and its injurious effect as viewed by the representatives of the eastern lines, and the apprehension of still further and more injurious action by the western lines.

In my judgment the restraining order should remain in force a reasonable length of time to allow the complainants to present this matter to the Interstate Commerce Commission, and in the meantime the case here will be stayed until a determination by that body as to whether the proposed increase in rate is reasonable and proper, and as to what is a reasonable rate.