## COLUMBUS IRON & STEEL CO. v. KANAWHA & M. RY. CO.

(Circuit Court, S. D. West Virginia.   May 27, 1909.)

### No. 156.

COMMERCE (§ 89*)—INTERSTATE COMMERCE ACT—JURISDICTION TO ENJOIN ESTABLISHMENT OF RATES.

A Circuit Court of the United States possessed no jurisdiction, prior to the enactment by Congress of legislation regulating the transportation of interstate commerce, to enjoin the promulgation and enforcement generally by a carrier of a particular rate or schedule of rates as unreasonable, its power being limited in any case to the protection of an individual shipper against the exaction from him of an unreasonable rate or charge, either local or interstate, when it had jurisdiction by reason of diverse citizenship; nor has it jurisdiction under Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1907. p. 892). to enjoin the filing, publication, or enforcement of a proposed rate alleged to be unreasonable, in advance of action thereon by the Interstate Commerce Commission, which is by said acts vested with exclusive jurisdiction to determine the reasonableness of rates in the first instance.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 89.*

Jurisdiction of federal courts of suits under interstate commerce act, see note to Bailey v. Mosher, 11 C. C. A. 318.]

In Equity.   On motion for preliminary injunction and demurrer to bill.

On April 10, 1909, complainant tendered to a judge of the United States Circuit Court for the Southern District of West Virginia its bill against Kanawha & Michigan Railway Company, seeking an injunction to restrain the defendant company from filing with the Interstate Commerce Commission a certain proposed schedule of joint rates on coal shipments between points on the line of defendant company in West Virginia and points on the Great Lakes, and from proceeding in any wise to put such proposed rates into effect.   Upon the allegation contained in the original bill that the defendant proposed to file these rates with the Commission on April 12, 1909, and that there was no time to give notice to the defendant of the application for a preliminary restraining order, and that if the rates were permitted to be filed they would necessarily go into effect and be charged to the plaintiff, resulting in immediate and irreparable injury to it, the judge reluctantly granted a temporary restraining order, setting the motion for a preliminary injunction down for hearing on the 23d day of April, 1909; that being the earliest date on which the court (owing to prior engagements) would have an open date on which to hear the matter.   On April 23, 1909, both parties to the bill appeared by their respective attorneys, and thereupon the plaintiff tendered and asked leave to file an amended bill, which leave was granted over the formal objection of defendant.   The defendant thereupon tendered its written demurrer to the original bill, which by agreement of counsel in open court is to be treated as a demurrer to both the original and amended bills as filed, which demurrer was ordered to be filed, and the matters of law arising thereon were argued and submitted, and the temporary re-

straining order theretofore granted was continued in force pending the decision upon the demurrer.

The matter is now before me upon the motion for a temporary injunction and upon the said demurrer. The points specially relied on in the demurrer are in effect the following: (1) That it appears by the bill that the matter in dispute arises under the act of Congress regulating interstate commerce, and that it does not appear from the bill that the court has jurisdiction of the subject-matter, for the reason that it does not appear therefrom that the question of the reasonableness or fairness of the proposed rates has been passed upon by the Interstate Commerce Commission, in whom, it is alleged, is vested the sole power to determine questions of that character relating to interstate commerce, and that it does not appear that complainant, or any other person or corporation interested therein, has filed any complaint with said Commission respecting said proposed rates. (2) That the allegations of the bill do not make a case for equitable relief. In order to see just what the case made by the bill is, I will endeavor, as briefly as may be, to present its essential features:

The complainant, reciting by way of preamble that it is a corporation organized under the laws of Ohio and a citizen of said state, brings this bill of complaint, "for itself and for and on behalf of all persons or corporations engaged in mining and shipping coal to points on the Great Lakes over and by the line of the Kanawha & Michigan Railway Company, who would be affected by the proposed increase of rates in this bill complained of, against the Kanawha & Michigan Railway Company," a corporation organized under the laws of West Virginia, and being a citizen of that state and a resident and inhabitant of the Southern judicial district thereof; that the plaintiff has two mines on the line of defendant's road in Fayette county, W. Va., and has invested about $275,000 in its business, and has contract for the coming year for 100,000 tons of coal for what is known as the "lake trade"; that the entire product of its mines is shipped over the defendant's railway; that the defendant is a common carrier engaged in interstate commerce; that there are a great many other mines, besides plaintiff's, situate along defendant's line of road in Kanawha and Fayette counties, W. Va., which ship coal over defendant's line to lake ports; that all of these mines are in what is known as the "Kanawha District," and that all would be affected alike by the proposed increased rates from said district to lake ports; that since 1904 the defendant and its connecting lines have had in force a joint rate on coal of 97 cents per ton from all points in the Kanawha district to Toledo, Ohio, and that said rate is now in effect; that for the years 1901 to 1903 the rate from said district to Toledo was $1.02 per ton, and that, while said rate now in existence is not highly remunerative, it is a just and reasonable rate, "because with an increase of said rates it would not be possible for the mines on said Kanawha & Michigan Railway to continue shipping into that market," etc.; that in selling coal in the lake trade plaintiff not only competes with other producers on the line of defendant railway, but with other West Virginia coal fields, to wit, Thacker, Pocahontas, and Kenova districts on the Norfolk & Western Railway, Fairmont district on the Baltimore & Ohio Railway, Kanawha and New River on the Chesapeake & Ohio Railway, and also with coal from the Eastern Ohio district and coal from the Pittsburg district in Pennsylvania: that these competitors in the Ohio and Pittsburg districts, although now enjoying lower rates than those in force in the Kanawha district on defendant's line, have demanded of the railway companies on whose lines they are situated, to wit, the Pennsylvania Lines, the Wheeling & Lake Erie Railway Company, and the Baltimore & Ohio Railway Company, that the existing differentials be largely increased, either by a reduction of the rates to them or by an increase on the rates from the Kanawha district on defendant's line; that in obedience to these demands pressure has been brought to bear on defendant by the Pennsylvania Lines and by the Wheeling & Lake Erie Railway Company to compel it to increase its rates by threats to bring on a general rate war, and thus, though knowing that the existing rate is just and reasonable, defendant has been forced to yield, and has announced that, effective May 15th, the rates on lake coal to Toledo from Kanawha district will be $1.06¼ cents per ton; that if these

rates are allowed to be filed and go into effect plaintiff will be unable to fill its contract without loss to itself; that plaintiff is without remedy at law, because if the rates go into effect they cannot be corrected by the Interstate Commerce Commission in time to enable plaintiff to gain any business in the lake trade this year, and that this will result in loss of business in future years, etc.; that existing rates give a present differential in favor of Ohio and Pennsylvania coal operators of 9 cents per ton and that the proposed increase of freight rate will increase this differential to 18¼ cents, which will practically bar West Virginia coal from the Kanawha district from the lake market. As a makeweight, probably, the bill avers that these proposed rates will be filed as the result of a combination, conspiracy, and agreement in restraint of interstate trade. It is also averred that the matter "in controversy in this suit in the case of your orators alone is more than $2,000, exclusive of interest and costs."

Z. T. Vinson and E. W. Knight, for plaintiff.

Jas. H. Hoyt, J. T. Lewis, J. H. Holt, and Jos. I. Doran (Holt & Duncan, of counsel), for defendant.

KELLER, District Judge (after stating the facts as above). The important inquiries suggested by the motion for a temporary injunction and by the demurrer to the bill are, first, has the court jurisdiction of the subject-matter of the bill; and, if so, second, does the bill make a case for the relief prayed for?

Manifestly, if the first inquiry be answered in the negative, there is no occasion to proceed with a consideration of the second. I will therefore first address myself to the broad and important question whether the Circuit Courts of the United States possess jurisdiction to grant relief of the character prayed for in this bill, and as a preliminary it is necessary to inquire just what that relief is, and under what grant of jurisdictional power the aid of the Circuit Court is asked; for it is axiomatic that the inferior federal courts are courts of limited jurisdiction, possessing only those powers which have been conferred on them by Congress under the permissive power granted by the Constitution for their establishment. U. S. v. Hudson, 7 Cranch, 32, 3 L. Ed. 259.

In the late case of Kentucky v. Powers, found in 201 U. S. 1, 26 Sup. Ct. 387, 50 L. Ed. 633, the same is expressed in these words:

"The subordinate judicial tribunals of the United States can exercise only such jurisdiction, civil and criminal, as may be authorized by act of Congress."

I take it for granted that there is no contention here that this court can derive any jurisdictional power by reason of the allegations of the bill to the effect that the threatened wrong complained of originated as the result of an illegal combination and conspiracy in restraint of trade, because the definite threatened injury is the filing of interstate joint rates under the provisions of Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3151), as amended by Act June 29, 1906, c. 359, 34 Stat. 584 (U. S. Comp. St. Supp. 1907, p. 892), and I gather that the allegations to which I have referred were introduced as foundations for evidence tending or intended to show that the rates so proposed to be filed were unreasonable, as not proceeding from the necessities of the carrier for an increased rate, but imposed upon it against its will and by reason of the vis major of such combination. For the

purposes of this inquiry we need not consider whether such evidence would or would not be admissible upon the question of the reasonableness and bona fides of the rates proposed to be filed, because the question here is purely that of jurisdiction, and no relief is sought by the bill under the provisions of what is known as the "Sherman Act," nor could it be granted under the provisions of that act, were it directly so sought. Minn. v. Northern Securities Co., 194 U. S. 48, 24 Sup. Ct. 598, 48 L. Ed. 870; Southern Indiana Express Co. v. U. S. Express Co. (C. C.) 88 Fed. 659; Id., 92 Fed. 1022, 35 C. C. A. 172. Gulf, etc., R. R. Co. v. Miami Steamship Co., 86 Fed. 407, 30 C. C. A. 142; Pidcock v. Harrington (C. C.) 64 Fed. 821; U. S. v. Atchison, T. & S. F. R. Co. (C. C.) 142 Fed. 176.

We are remitted then, for the ground of the jurisdiction invoked by the bill, to one of two sources. Either it must have been granted by Congress under the general statutes conferring jurisdiction, or by the interstate commerce act itself. The subjects of civil jurisdiction embraced in the jurisdictional act of March 3, 1875 (18 Stat. 470, c. 137), were substantially the same as they are under the amendments of 1887 (Act March 3, 1887, c. 373, 24 Stat. 552) and 1888 (Act Aug. 13, 1888, c. 866, 25 Stat. 433 [U. S. Comp. St. 1901, p. 508]); but the act provided for a jurisdictional value of $500, instead of $2,000, as now required. Prior to the passage of the interstate commerce act no jurisdiction in respect 'to that subject could have existed by virtue of any special act, because Congress had not exercised its right to regulate that subject. It is 'also true that a suit having for its precise object the restraining of a carrier from filing a schedule of rates with the Interstate Commerce Commission could not have been brought under the general laws in any court prior to the passage of the interstate commerce act, because there was no such body as the Interstate Commerce Commission and there was neither opportunity for nor obligation upon a railroad company to file its rates anywhere.

Prior, then, to the passage of the aforesaid act, the theory of jurisdiction in a case seeking to prevent the enforcement of alleged unreasonable rates for transporting goods between any two points, whether within the limits of the same state or in two different states, was that of the inherent right of a court of equity to prevent the enforcement of excessive and unreasonable rates as against a suitor seeking its protection. The jurisdiction at that time did not arise under the Constitution or any law of the United States, and could not have existed in any inferior federal court save as it arose by reason of a diversity of citizenship existing between the parties, and in which case such court could, concurrently with the state courts, exercise the jurisdiction in equity exercised by the state courts to prevent a common-law injury for which there was no appropriate legal remedy or to enforce the common-law legal remedy for the violation of a common-law right.

But such suits in equity prior to the passage of the interstate commerce act were purely personal between the parties to the suit, and in no way affected the rights of third parties, or those of the de-

fendant transportation company in respect to third parties.  For example, if defendant was enforcing a rate from Cincinnati to Chicago that A., a shipper, claimed to be unreasonable, and he brought a suit in equity to enjoin the enforcement of such rate against him, nothing in that proceeding at all interfered with the right of the defendant to enforce the rate against B. and all other shippers similarly situated, and hence the damage to the defendant was limited to the charges it had been enjoined from enforcing against A., and the means of recouping such damage might and probably would have been provided for by bond.  On the other hand, if the chancellor concluded that the injunction should not be granted, or should be dissolved, his action in that regard did not preclude B., or any other shipper, from applying in any court of competent jurisdiction for like relief on his part to that prayed for by A.  This was true because transportation by common carriers all stood upon the same footing, and no attempt had been made by Congress to regulate by statutory enactment the one branch thereof in respect to which section 8, art. 1, of the Constitution of the United States had provided that:

"The Congress shall have power * * * to regulate commerce with foreign nations, and among the several states and with the Indian tribes."

This power is manifestly a very extensive and important one as relates to commerce among the several states at the present time. but at the time of the adoption of the Constitution the instruments of such commerce were so meager that it was not considered important or necessary to enforce the power by legislation, and when it became apparent that the good of the public required such legislation the transportation interests had become so powerful that efforts in that direction were successfully opposed until the act of February 4, 1887, known as the "Interstate Commerce Act," was passed.  During all this time the only checks upon the instruments of commerce, whether internal or interstate, were those imposed by the courts under their general powers to protect against wrong, and these checks the courts imposed, not in any attempt to regulate interstate commerce, but under their general powers to prevent wrong or to give damages for a wrong suffered, and their judgments and decrees were always limited to the matters and to the parties before them on the pleadings.

That this limited jurisdiction existed is held by the Supreme Court of the United States in which Mr. Justice White says in his opinion in Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U. S. 436, 27 Sup. Ct. 350, 51 L. Ed. 557:

"It may not be doubted that at common law, where a carrier refused to receive goods offered for carriage except upon the payment of an unreasonable sum. the shipper had a right of action in damages.  It is also beyond controversy that when a carrier accepted goods without payment of the cost of carriage, or an agreement as to the price to be paid, and made an unreasonable exaction as a condition of the delivery of the goods, an action could be maintained to recover the excess over a reasonable charge.  And it may further be conceded that it is now settled that even where, on the receipt of goods by a carrier, an exorbitant charge is stated, and the same is coercively exacted, either in advance or at the completion of the service, an

action may be maintained to recover the overcharge. 2 Kent, Com. 599, and note A; 2 Smith, Lead. Cas. (8th Ed., Hare & W. notes) pt. 1, p. 457."

It becomes important to determine what effect the passage of the interstate commerce law, with its amendments, has necessarily had upon this admitted jurisdiction, so far as that jurisdiction existed in relation to interstate rates. To properly examine that question I know of no better way to consider the intent and effect of that legislation than by glancing at "the old law, the mischief, and the remedy." As to the "old law," there was none, except the common-law doctrine already adverted to, the administration of which was necessarily confined within the narrow limits of redressing private injuries, or preventing them, upon a proper showing, by the injunctive powers of the court. The mischief of this condition was very apparent. Possibly the greatest evil to the public arose from the fact that no requirement existed for the publicity and uniformity of rates, thus enabling the carrier to discriminate between shippers with comparatively little danger of detection and consequent suit by the injured party. Another mischief was that no power existed to compel fair dealing toward the entire public, or to punish for a failure to so deal.

In Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U. S. 439, 27 Sup. Ct. 354 (51 L. Ed. 557), supra, Mr. Justice White, in discussing the causes that led to the passage of this act and the mischiefs remedied by it, says:

"When the act to regulate commerce was enacted, there was contrariety of opinion whether, when a rate charged by a carrier was in and of itself reasonable, the person from whom such a charge was exacted had at common law an action against the carrier because of damage asserted to have been suffered by a discrimination against such person or a preference given by the carrier to another. Parsons v. Chicago, etc., W. R. Co., 167 U. S. 447, 455, 17 Sup. Ct. 887, 42 L. Ed. 231, 234; Interstate Commerce Commission v. Baltimore & O. R. Co., 145 U. S. 263, 275, 12 Sup. Ct. 844, 36 L. Ed. 699, 703, 4 Interst. Com. R. 92. That the act to regulate commerce was intended to afford an effective means for redressing the wrongs resulting from unjust discrimination and undue preference is undoubted. Indeed, it is not open to controversy that to provide for these subjects was among the principal purposes of the act. Interstate Commerce Commission v. Cincinnati, N. O. & T. P. R. Co., 167 U. S. 479, 494, 17 Sup. Ct. 896, 42 L. Ed. 243, 251. And it is apparent that the means by which these great purposes were to be accomplished was the placing upon all carriers of the positive duty to establish schedules of reasonable rates which should have a uniform application to all, and which should not be departed from so long as the established schedule remained unaltered in the manner provided by law. Cincinnati, N. O. & T. P. R. Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935, 5 Interest. Com. R. 391; Id., 167 U. S. 479, 17 Sup. Ct. 896, 42 L. Ed. 243."

The remedy for these evils provided by Congress was the act of February 4, 1887, with its amendments, commonly known as the "Interstate Commerce Act." By the ninth section of that act it was provided:

"That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act may either make complaint to the Commission, as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this act, in any District or Circuit Court of the United States of competent jurisdiction; but such person or

persons shall not have the right to pursue both of said remedies, and must, in each case, elect which one of the two methods of procedure herein provided for, he or they will adopt."

And by section 22 existing appropriate common-law and statutory remedies were saved.

In Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, the effect of both of these provisions was considered by the court, and it was therein held that the independent rights of individuals to obtain pecuniary redress under the provisions of Act Feb. 4, 1887, c. 104, § 9, 24 Stat. 382 (U. S. Comp. St. 1901, p. 3159)—

"must be confined to such wrongs as can, consistently with the context of the act, be redressed without previous action by the Commission; and the provision of section 22, that nothing therein 'shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies,' cannot be construed as continuing in shippers a common-law right, the continued existence of which would be absolutely 'inconsistent with the provisions of the statute." Third point of syllabus.

It is conceded that this decision finally and conclusively denies the right of an individual to sue in any court to recover for an alleged overcharge, on the pure ground that the same was unreasonable per se, prior to a determination by the Commission of that fact, and it was conceded in the argument that by a parity of reasoning this court would have no jurisdiction to enjoin, prior to action by the Commission, the further enforcement of an existing rate on the ground that it was unreasonable, and that its enforcement would result in irreparable damage to complainant or give rise to a multiplicity of suits; but it is strenuously insisted that the same reasons do not apply where the relief sought is against the filing and enforcement of a schedule of rates not already filed, but notice of whose filing has been given by the carrier.

To that proposition I cannot assent. To do so would be to declare that a court may have an independent jurisdiction to prevent a threatened wrong when it would have no power to award reparation for the completed injury, a proposition utterly opposed to all ideas of natural justice and the powers of tribunals. To my mind the same reasoning which so clearly shows that the power sought to be exercised by the court in the Abilene Cotton Oil Co. Case was repugnant to the provisions of the act to regulate commerce applies with equal force to an attempt by the aid of the court, in an independent suit in equity, to prevent the filing of a schedule which it is made the duty of a carrier to file if he desires to change his rates. To hold otherwise would be to utterly deny to the Interstate Commerce Commission a power and duty primarily committed to it by Congress, viz., the power and duty to decide upon the reasonableness of rates, because the jurisdiction of the Commission cannot be exercised over unfiled rates.

By the act of June 29, 1906, amending section 6 of the interstate commerce act, it was provided, inter alia, that the Commission—

"may in its discretion and for good cause shown allow changes [in rates] upon less than the notice herein specified, or modify the requirments of this section in respect to publishing, posting and filing of tariffs, either in

particular instances or by a general order applicable to special or peculiar circumstances or conditions."

I cannot conceive of a case in which the action of a court could exert a wider or more far-reaching effect in the way of invading the province of the Commission, or be more repugnant to the general scope and purposes of the act, than by issuing its injunction to prevent the filing of a schedule of rates with that body.

But it is suggested and pointed out in argument that the contentions of plaintiff have been practically sustained by eight courts or judges of the United States, and denied by only three of such courts or judges. Counsel for plaintiff cite Macon Grocery Co. v. Atlantic Coast Line R. Co, (C. C.) 163 Fed. 746, M. C. Kiser Co. v. Central of Georgia Ry. Co. (C. C.) 158 Fed. 194, Jewett Bros. & Jewett v. Chicago, W. & St. P. Ry. Co. (C. C.) 156 Fed. 160, Northern Pac. Ry. Co. et al. v. Pacific Coast Lumber Mfrs.' Ass'n et al. (C. C. A.) 165 Fed. 1, and the dissenting opinion of Judge Shelby in Atlantic Coast Line R. Co. v. Macon Grocery Co. (C. C. A.) 166 Fed. 219 et seq., as sustaining the jurisdiction of the court in a case like the present. On the other hand, they admit that the majority opinion in Atlantic Coast Line R. Co. v. Macon Grocery Co. (C. C. A.) 166 Fed. 206, and the dissenting opinion of Judge Ross in the case of Union Pac. R. Co. v. Oregon & Washington Lumber Mfrs.' Ass'n et al. (C. C. A.) 165 Fed. 13, are entirely adverse to the claim of jurisdiction in a case like the present one.

It might, perhaps, be sufficient for this court to say that the reasoning in the majority opinion in Atlantic Coast Line R. Co. v. Macon Grocery Co. (C. C. A.) 166 Fed. 206, and in the dissenting opinion of Judge Ross in 165 Fed. 13, accords with the view of this court more nearly than do any of the other cases cited. But I feel disposed to call attention to the fact that some of the cases apparently proceed upon a misapprehension of the powers of the Interstate Commerce Commission, or else upon a condition of facts totally unlike those existing in this case. Thus, in the Kiser Case, Judge Newman decided (158 Fed. 198) that:

"The court might properly enjoin carriers from establishing or increasing to an unreasonable rate, at the same time leaving the matter in such shape as that the Interstate Commerce Commission may ultimately determine whether the contemplated increase is just and reasonable."

The difficulty about such a jurisdiction is that it is utterly impracticable as applied to the present case. The Interstate Commerce Commission has been vested with no jurisdiction to determine whether a "contemplated" rate is reasonable or the reverse. Section 15 of the act, as amended June 29, 1906, limited the powers of the Commission to an investigation and action upon rates and charges "demanded, charged, or collected" by a common carrier, and could have no application to rates which had not yet been filed, but notice of whose filing had been given. So that Judge Newman's opinion is no authority for the power of injunction here invoked, but, on the contrary, the investigation of the question of reasonableness by the Interstate Commerce Commission could never occur if injunction prevented the filing of

the rates before that body. In the Jewett Case (C. C.) 156 Fed. 165, Judge Carland, recognizing this difficulty, says:

"It is only when upon complaint the Interstate Commerce Commission finds that a carrier is demanding, charging, or collecting rates in violation of law that this power to interfere with the rates arises. The carrier cannot be said to be demanding, charging, or collecting a rate until it has put the same into effect. It results that the Interstate Commerce Commission has nothing to do with the rates which are not in effect, or, in other words, which are not being demanded, charged, or collected by the carrier."

And upon the theory that, as the Interstate Commerce Commission cannot act upon a rate not in effect, a Circuit Court of the United States has jurisdiction to enjoin the filing and enforcement of an alleged unreasonable rate, if a proper case therefor is made, Judge Carland delivered his opinion to that effect, although dismissing the bill because it did not seek the court's determination of the alleged unreasonableness of the proposed rates. This opinion seems clearly to predicate the power of the court to determine the reasonableness of a proposed rate upon the failure of the interstate commerce act to provide that the Commission thereby created could suspend a rate pending investigation of its reasonableness. It may be freely admitted that this omission constitutes a defect in the interstate commerce act. In the Report of the Interstate Commerce Commission of 1908, at page 10, the following language occurs:

"In our last annual report attention was called to the fact that this Commission had no authority to restrain an advance in rates or a change in rule or regulation which imposes an additional burden. Railways may establish whatever interstate rates they choose. No proceeding can be begun before this Commission until the schedule establishing the rate has been filed. The order of the Commission, when made, cannot take effect in less than 30 days. If the investigation is to be one in reality as well as in name, if all parties are to be fully heard as they should be, several weeks, and usually several months, must elapse before a conclusion resulting in an order can be reached. Meantime the rate established by the carrier remains in effect. No carrier should be required to reduce its rates without a fair hearing. Neither, in our opinion, should the public be required to pay advanced rates without opportunity for a fair hearing. It would be easy to multiply instances and illustrations showing the confusion and discrimination which now exist. We renew our recommendation of one year ago that this Commission be given authority to restrain the advance of a rate or the change of a rule, regulation, or practice pending proceedings before it to determine the reasonableness of the advance of the change, and we earnestly call attention to the necessity for immediate action."

It is fundamental that defects in legislation can only be amended by the legislative power and it is not within the power of a court to extend its jurisdiction because the exigencies resulting from a piece of congressional legislation may seem to demand aid. That problem is for Congress alone. It is to be remembered, as already pointed out, that the power invoked in this case did not exist prior to the passage of the interstate commerce act; and if the grant of such power cannot be found in that act it does not exist.

The plaintiff in this bill seems to rely greatly in support of the jurisdiction here invoked upon the authority of that portion of the opinion of the Supreme Court of the United States in the case of Southern

171 F.—46

Ry. Co. v. Tift, 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124, wherein occurs this language:

"In the case at bar, however, there are assignments of error based on the objections to the jurisdiction of the Circuit Court. These might present serious questions in view of our decision in Texas & Pacific Railroad Company v. Abilene Cotton Oil Company, 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, upon a different record than that before us. We are not required to say, however, that, because an action at law for damages to recover unreasonable rates which have been exacted in accordance with the schedule of rates as filed is forbidden by the interstate commerce act, a suit in equity is also forbidden to prevent a filing or enforcement of a schedule of unreasonable rates or a change to unjust or unreasonable rates."

In most of the opinions cited by plaintiff to sustain the jurisdiction contended for, this passage has been the basis of the court's holding that the jurisdiction existed; and, stripped of all connection with its context, the dictum might seem to give encouragement to the view that it favored the existence of the jurisdiction. But, when coupled with the context, this idea is no longer tenable. Let us see what follows:

"The Circuit Court granted no relief prejudicial to appellants on the original bill. It sent the parties to the Interstate Commerce Commission, where, upon sufficient pleadings, identical with those before the court, and upon testimony adduced upon the issues made, the decision was adverse to the appellants. This action of the Commission, with its findings and conclusions, was presented to the Circuit Court, *and it was upon these, in effect, the decree of the court was rendered.* [Italics mine.] There was no demurrer to that petition, and the testimony taken before the Commission was *stipulated* into the case, and the opinion of the court recites that, 'with equal meritorious purpose, counsel for respective parties agreed that this would stand for and be the hearing for final decree in equity.'"

Now it was upon this record that the Supreme Court was asked to pass upon objections to the jurisdiction which, it says, upon a different record "might present serious questions"—upon a record in which the court granted no relief upon the original bill "prejudicial to appellants," a record into which was stipulated the testimony subsequently taken before the Interstate Commerce Commission upon a complaint made under the provisions of section 15 of the interstate commerce act. In view of all this, the Supreme Court proceeds:

"It was certainly competent for the appellees to proceed in the Circuit Court under section 16 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), and to apply by petition to the Circuit Court, 'sitting in equity,' for the court to hear and determine the matter 'as a court of equity,' and issue an injunction 'or other proper process mandatory or otherwise,' to enforce the order of the commission. We think that under the broad powers conferred upon the Circuit Court by section 16 and the direction there given to the court to proceed with efficiency, but without the formality of equity proceedings, 'but in such manner as to do justice in the premises,' and in view of the stipulation of the parties, recited in the decree of the court, the appellants are precluded from making the objection that the court did not have jurisdiction to entertain the petition and grant the relief prayed for and decreed."

After the above statement of the contents of the record in the Tift Case, and the view of the relief granted, I fail to see how anything in the opinion of the Supreme Court can be construed into implied approval of the doctrine that the Circuit Court of the United States has jurisdiction in advance of action by the Interstate Commerce Com-

mission to enjoin the filing or enforcement of rates alleged to be unreasonable. I conclude, therefore, that a proper construction of the act of February 4, 1887, forbids the exercise of jurisdiction in a case like the present, because it is inconsistent with the purposes of that act, as expressed therein and as construed and expounded by the Supreme Court of the United States in the leading cases of Texas & P. R. Co. v. Abilene Cotton Oil Co., 204 U. S. 436, 27 Sup. Ct. 350, 51 L. Ed. 553, and Southern Ry. Co. v. Tift, 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124.

It follows, from what I have said, that the temporary restraining order heretofore awarded must be dissolved, and the bill dismissed for lack of jurisdiction and without prejudice; and it is so ordered.

COMMERCE (§ 89\*)—INTERSTATE COMMERCE ACT—JURISDICTION TO ENJOIN ESTABLISHMENT OR ENFORCEMENT OF RATES.

