M. C. KISER CO. et al. v. CENTRAL OF GEORGIA RY. CO. et al.

(District Court, S. D. Georgia. September 22, 1916.)

COMMERCE ⬦�longdash89—INCREASE OF RATES BY INTERSTATE CARRIERS—INJUNCTION.
  Aside from the question of power, under Interstate Commerce Act Feb.
  4, 1887, c. 104, § 15, 24 Stat. 384, since its amendment by Act June 18.
  1910, c. 309, § 12, 36 Stat. 551 (Comp. St. 1913, § 8583 [2]), authorizing the
  Interstate Commerce Commission to suspend a proposed new rate pend-
  ing a hearing as to its reasonableness, a court will not interfere by in-
  junction to restrain the enforcement of such a new rate, where the Com-
  mission, on application and after being fully advised, has refused to sus-
  pend it.
  [Ed. Note.—For other cases, see Commerce, Dec. Dig. ⬦�longdash89.]

In Equity. Suit by the M. C. Kiser Company and others against
the Central of Georgia Railway Company and another. On motion
for interlocutory injunction. Denied.

See, also, 158 Fed. 193.

The M. C. Kiser Company, the J. K. Orr Shoe Company, the Rice & Hutch-
ins Atlanta Company, and the Gramling-Spalding Company, all corporations
of Atlanta, Ga., on September 12, 1916, presented their petition in equity
against the Central of Georgia Railway Company and the Ocean Steamship
Company, to the District Court of the United States for the Eastern Division
of the Southern District of Georgia, in which they alleged, in brief, that they
were wholesale dealers in boots and shoes, doing business in Atlanta, Ga.,
and that the defendants were common carriers engaged, among other things,
in the transportation of boots and shoes from Boston, Providence, and New
York to Atlanta by water and rail, and that the defendants, along with
other interstate carriers, under date of August 1, 1916, had issued and filed
certain supplements to existing tariffs, whereby the then existing commodi-
ty rate of 95 cents per 100 pounds on boots and shoes from said Eastern
cities to Atlanta would be withdrawn, and the first-class rate of $1.19 from
Boston and Providence, and $1.14 from New York to Atlanta, ocean and rail,
would become effective on September 15, 1916; that complainants, upon re-
ceipt of notice of the proposed advance, promptly filed their protest with the
Interstate Commerce Commission, and prayed the Commission to suspend
the operation of the new schedule of advanced rates until the reasonableness
of the proposed rates could be determined by the Commission, as provided
by law; that complainants were given an informal hearing on their protest
before the suspension board of the Interstate Commerce Commission at
Washington on August 31, 1916, in which hearing counsel for the carriers
also participated; that thereafter, on September 7, 1916, the secretary of the
Commission gave notice that the Commission had declined to suspend the pro-
posed new rates protested against, but that its refusal to suspend carried with
it no expression of approval, and was without prejudice to the right of any
one to challenge in a formal proceeding the reasonableness of the proposed
new schedules.

Complainants further alleged that the existing rate of 95 cents per 100
pounds had previously been passed upon and approved by the Interstate
Commerce Commission at two or three different hearings, and that said rate
had been in existence from April 1, 1910, and that complainants, in reliance
upon the continuance of the existing rates, had made extensive investments
in Atlanta, and had made contracts for the purchase of shoes to be shipped to
Atlanta over the lines of defendants from Boston, New York, and Providence,
and had also made contracts for the sale of these goods during the coming
season, and that the proposed increase in rates would impose an additional
freight burden of approximately $15,000 upon complainants, and that they
would thereby, as well as in other respects, suffer irreparable injury and

⬦�longdashFor other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

damage. They alleged that the new rates were unreasonable, and that they had no adequate remedy at law, and they prayed that the defendants should be enjoined from putting in effect the proposed advanced rates, or altering the present status, until a full hearing and determination concerning the reasonableness of the rates should be had by the Interstate Commerce Commission.

A temporary restraining order was granted, and a rule was issued against the defendants to show cause on the 22d of September, 1916, why an interlocutory injunction should not issue against the defendants as prayed. At the hearing the defendants appeared and filed their response to the rule so served upon them, and also filed a motion to dismiss, and their answer to the petition.

Wm. A. Wimbish, of Atlanta, Ga., for complainants.

Lawton & Cunningham, of Savannah, Ga., and Charles D. Drayton, of Washington, D. C., for defendants.

LAMBDIN, District Judge (after stating the facts as above). The questions involved are of great importance, both to the complainants and to the common carriers. This is a petition brought by four wholesale boot and shoe dealers in the city of Atlanta against the Central of Georgia Railway Company and the Ocean Steamship Company, asking that the court shall enjoin the collection of the excess of the new rates which have recently been published by the defendants over the rates which have heretofore existed between Boston, New York, and other Eastern ports and Atlanta, pending a full hearing of the reasonableness or unreasonableness of the new rates by the Interstate Commerce Commission.

The Constitution of the United States vests the power to regulate interstate commerce in Congress. In 1887 Congress in pursuance of this power created the Interstate Commerce Commission, and the power to determine the reasonableness or unreasonableness of the rates of interstate carriers, and to decide whether they were discriminatory or not, is vested exclusively in this Commission. The particular rates involved here have been the subject-matter of litigation in court and of contests before the Interstate Commerce Commission for a period of something like ten years. The records in this and other similar controversies between the parties show that prior to 1905 the rail and water rate in force between the Eastern ports and Atlanta was $1.14 per 100 pounds, but that for a short time in the early part of 1905, on account of reasons which are in dispute, the carriers reduced their rates between the Eastern ports and Atlanta to 85 cents. In April, 1905, the carriers endeavored to increase this rate to 93 cents on carload lots, and $1.05 on less quantities, and thereupon a bill was brought by the M. C. Kiser Company and the J. K. Orr Shoe Company against the defendants and other common carriers in the United States Circuit Court for the Northern District of Georgia to enjoin the increase, and Judge Newman, on April 29, 1905, granted a temporary restraining order, and thereupon the affected carriers after due notice withdrew the notice of the advance, thereby leaving the 85-cent any-quantity rate in effect. This status continued for nearly three years, and until December 31, 1907, when Judge Newman after a hearing handed down an opinion in the case, to be found in 158 Fed. 193, directing that the existing rate should remain in force for a rea-

sonable time thereafter, so that complainants might present the matter to the Interstate Commerce Commission, in order to obtain from that body a determination of the reasonableness of the proposed rates. The Interstate Commerce Commission, I understand, has passed on the matter twice, once in 1909, and again in 1914 (see 17 I. C. C. Rep. 43, and 31 I. C. C. Rep. 154), in both of which cases it held that a 95 cents per 100 pounds rate was a just and reasonable any-quantity rate between the points in question. A petition for a rehearing was filed in both instances, and the matter has been practically in the continuous view of the Interstate Commerce Commission for the last eight or ten years. The last application for a rehearing of the rates fixed in 1914, was not finally decided, I believe, until July of this year.

The reasonableness of the rates in question has, therefore, been practically under the view of the Interstate Commerce Commission for the last eight years. The Commission has kept in constant touch with the situation, and has been constantly advised, by reason of these hearings and rehearings and application for rehearings on the subject, up to the present time. The carriers gave notice on August 1, 1916, that the published new schedule of rates would become effective on September 15, 1916. At once the petitioners here filed a protest with the Interstate Commerce Commission, and in connection therewith made an application for the suspension of these rates pending a full hearing on the subject. In that petition, which was full and elaborate, petitioners urged practically all of the points made by their present bill. This application to the Commission for a suspension of the rates is expressly provided for by the amendment of June 18, 1910, to section 15 of the Interstate Commerce Act, which is in the following language:

"Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the Commission shall have, and it is hereby given, authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders, without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the propriety of such rate, fare, charge, classification, regulation, or practice; and pending such hearing and the decision thereon the Commission upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension may suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than one hundred and twenty days beyond the time when such rate, fare, charge, classification, regulation, or practice would otherwise go into effect; and after full hearing, whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the Commission may make such order in reference to such rate, fare, charge, classification, regulation, or practice as would be proper in a proceeding initiated after the rate, fare, charge, classification, regulation, or practice had become effective: Provided, that if any such hearing can not be concluded within the period of suspension, as above stated, the Interstate Commerce Commission may in its discretion, extend the time of suspension for a further period not exceeding six months. At any hearing involving a rate increased after January first, nineteen hundred and ten, or of a rate sought to be increased after the passage of this act, the burden of proof to show that the increased rate * * * is just and reasonable shall be upon the common

carrier, and the Commission shall give to the hearing and decision of such questions preference over all other questions pending before it and decide the same as speedily as possible."

Prior to the passage of that amendment several bills in equity had been filed in the different courts of the United States in cases where the carriers of the country had attempted to increase their rates, praying for injunction against the collection of the newly published rates, pending a full hearing before the Commission. The courts differed upon the power of the United States courts to entertain these bills. Some courts of high repute held that a court of equity had the power to enjoin the collection of the new rates pending a hearing; and other courts held to the contrary. They all, of course, held that the question of the reasonableness or unreasonableness of the rates is purely a matter of determination by the Interstate Commerce Commission, and that the conclusion of the Commission is final. The only difference on the subject was whether the courts had a right to interfere and to enjoin the collection of the rates pending a determination of this matter by the Interstate Commerce Commission. For the affirmative on this subject, see M. C. Kiser Co. et al. v. Central of Georgia Ry. Co. et al. (Circuit Court, Northern District of Georgia) 158 Fed. 193; Jewett Bros. et al. v. Chicago, M. & St. P. Ry. Co. (Circuit Court, Dist. South Dakota) 156 Fed. 160; Northern Pacific Ry. Co. v. Pacific Coast Lumber Mfrs'. Ass'n et al. (C. C. A., 9th Circuit) 165 Fed. 1, 91 C. C. A. 39. For the negative, see Columbus Iron & Steel Co. v. Kanawha & M. Ry. Co. (C. C. A., 4th Circuit) 178 Fed. 261, 101 C. C. A. 621; Atlantic Coast Line R. Co. v. Macon Grocery Co. et al. (C. C. A., 5th Circuit), 166 Fed. 206, 92 C. C. A. 114.

In this situation, with the courts holding divergent views as to their power as to this matter, Congress passed this amendment of June 18, 1910, which I have quoted above, which confers upon the Interstate Commerce Commission the power to suspend such rates or the enforcement of such rates until a full investigation on the part of the Commission. The point here involved is whether this remedy is exclusive or not—whether it ousts the United States courts of their general equity jurisdiction on that particular subject. The court is inclined to think the intention of Congress was to make the remedy provided by the amendment exclusive. As stated by the Supreme Court of the United States in the case of B. & O. R. R. v. Pitcairn Coal Co., 215 U. S. 481, at page 494, 30 Sup. Ct. 164, at page 169 (54 L. Ed. 292):

"In considering section 15 in the case of Interstate Commerce Commission v. Illinois Central Railroad Co., just decided [215 U. S. 452, 30 Sup. Ct. 155, 54 L. Ed. 280], it was pointed out that the effect of the section was to cause it to come to pass that courts, in determining whether an order of the Commission should be suspended or enjoined, were without power to invade the administrative functions vested in the Commission, and therefore could not set aside an order duly made on a mere exercise of judgment as to its wisdom or expediency. Under these circumstances it is apparent, as we have said, that these amendments (of 1906) add to the cogency of the reasoning which led to the conclusion in the Abilene Case [204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, 9 Ann. Cas. 1075] that the primary interference of the courts with the administrative functions of the Commission was wholly incompatible with the act to regulate commerce."

The court does not think it necessary at this time, however, to decide the question whether this power is exclusively vested in the Interstate Commerce Commission by the amendment of 1910, or not. The power, however, to temporarily suspend the operation of a new schedule, pending a full hearing as to its reasonableness by the Commission, is now lodged with the Interstate Commerce Commission. It was an act of wisdom on the part of Congress to vest such power in the Interstate Commerce Commission, because that body is the most competent of all tribunals to decide the question whether new rates should be so suspended or not. If it should be considered that the power of the Commission on the subject is not exclusive, and that the power still remains in a court of equity to suspend, pending a full hearing by the Interstate Commerce Commission, this case presents the following situation:

Something like two years ago the carriers gave notice of an advanced rate between the same points, and a similar protest was then filed with the Interstate Commerce Commission by these same shippers, asking that the new rate be suspended pending an investigation by the Commission, and thereupon the rate was suspended by the Commission pending an investigation; and after a full investigation a decision was rendered in behalf of the shippers against the proposed advance in rates. In the case now before me, following their previous course, the shippers filed a protest with the Commission, making practically all the points they make in this bill, and asked for a suspension of the new rates, pending a full investigation of the subject. They voluntarily, on their own motion, invoked a hearing on the question by the Commission, and they obtained such a hearing, as far as the evidence discloses here, as was satisfactory to them. If the hearing which they secured was not satisfactory to them, doubtless, they could have obtained a fuller and more complete hearing before the board, by asking for same. At any rate, in the customary way, they went before this tribunal, which is vested with the power of determining the reasonableness or unreasonableness of rates, and of temporarily suspending newly filed rates, and invoked a ruling as to the suspension of the proposed new rates. That ruling turned out to be unfavorable to them, and now they come before this court, making the same points, and ask this court to decide the same question.

Inasmuch as they have already had one tribunal and a very competent one—one fully conversant with the subject and recently fully advised on the subject—to decide this question, the court hardly thinks that they should be permitted to experiment and come before another tribunal on the same question and invoke a ruling here. There is no good reason given here why the ruling of the Interstate Commerce Commission was not correct on the question. Nearly the entire argument addressed to the court here has been as to the power of the court to suspend the newly filed rates, and the reasons brought to the attention of the court as to why the new rates should be suspended are the same reasons which were addressed to the Interstate Commerce Commission, and this court is not disposed to reverse the ruling of that body. The power to suspend a proposed advance in rates, vested

by the amendment of 1910 in the Commission, is an administrative function, and in this sphere the court is inclined to think that the Commission is supreme. At any rate, when the Commission has acted in such a matter, the court should not substitute its judgment for that of the Commission. The question as to whether the court should enjoin the rates pending a full hearing, or not, would necessarily to a great extent turn on the Commission's opinion as to the reasonableness or unreasonableness of the new rates. This court cannot decide that question. It is not within its power to decide it, but such power is vested in the Commission exclusively.

Another reason urged before the court is that these shippers have made large investments, and have made contracts for the purchase and sale of goods on the basis of existing rates, and that they will suffer serious loss if these new rates are put into effect. . On that question the court is of the opinion that these shippers made such contracts with their eyes open; they knew that the old rates expired by limitation on September 1st; they knew that there was a chance of the rates being raised, and therefore they took the chances in the matter; and I do not see that the fact that a hardship may be imposed upon them. when they took the chances in this way, should be considered by the court, especially in view of the fact that, if the Interstate Commerce Commission should hereafter determine that the new rates are excessive, the shippers would have the right to obtain reparation. Besides, the courts have no right to suspend a rate which is reasonable and lawful so far as the carrier is concerned on the sole ground that it would be burdensome to the shipper.

The order that is proposed to the court by the complainants here is that the carrier shall only collect 95 cents, and shall charge these four shippers and any other shippers that may be made parties to the bill with the difference between that rate and the rate hereafter to be determined by the Commission. Complainants urge that this would only be a matter of bookkeeping between the parties, and at the end, when a decision on the question is made by the Commission, the matter could then be readily adjusted; the shippers paying to the carrier such difference. The court is of the opinion that the rule can just as well be worked the other way; that is, that these shippers can do the bookkeeping. They can pay the new rates when put in effect, and charge the carriers with the excess of the new rates over the existing rates on all their shipments over the route involved, and if the decision of the Interstate Commerce Commission is favorable to them, they can then collect the difference from the carriers, just as well as the carriers could collect the difference from them. Under the allegations of the bill, the court is of the opinion, therefore, that they have an adequate remedy at law on the subject.

Viewing the case in its entirety, and in consideration of the fact that the Interstate Commerce Commission, under the power which was wisely given it by the amendment of June 18, 1910, has refused to suspend the rate, and in view of the rule that all doubts in the mind of the court shall be resolved in favor of the constitutionality of an act of Congress, and also that due effect should be given to the expression of

the legislative will, so as not to render same meaningless or ineffective, the court is compelled to decline the injunction, and to dissolve the restraining order heretofore granted.